J-S53042-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| OBRIAN STEPHEN LEWIS | : | |
| | : | |
| Appellant | : | No. 3138 EDA 2017 |

Appeal from the Judgment of Sentence September 15, 2017
In the Court of Common Pleas of Montgomery County
Criminal Division at No(s):  CP-46-CR-0008655-2015

BEFORE:   GANTMAN, P.J., OTT, J., and PLATT*, J.

MEMORANDUM BY GANTMAN, P.J.:                **FILED SEPTEMBER 18, 2018**

Appellant, Obrian Stephen Lewis, appeals from the judgment of sentence entered in the Montgomery County Court of Common Pleas, following his jury trial convictions for two counts of first degree murder, burglary, criminal trespass, two counts of recklessly endangering another person, simple assault, and possession of an instrument of crime.[1]  We affirm.

In its opinion, the trial court fully and correctly sets forth the relevant facts and procedural history of this case.  Therefore, we have no reason to restate them.

Appellant raises the following issue for our review:

> DID THE TRIAL COURT ERR BY DENYING [APPELLANT'S]
> TIMELY MOTION FOR MISTRIAL WHEN A COMMONWEALTH

---

[1] 18 Pa.C.S.A. §§ 2502(a), 3502(a)(1), 3503(a)(1)(ii), 2705, 2701, 907, respectively.

---

*   Retired Senior Judge assigned to the Superior Court.

WITNESS REFERRED TO [APPELLANT'S] SILENCE?

(Appellant's Brief at 4).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Thomas C. Branca, we conclude Appellant's issue merits no relief. The trial court opinion comprehensively discusses and properly disposes of the question presented. (*See* Trial Court Opinion, dated January 9, 2018, at 11-18) (finding mistrial was not required where officer did not actually testify that Appellant exercised right to remain silent; officer's statement was innocuous when taken in context; Commonwealth did not deliberately elicit or exploit officer's testimony, and court promptly issued cautionary instruction to jury). Accordingly, we affirm on the basis of that opinion.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/18/18

**IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA**
**CRIMINAL DIVISION**

COMMONWEALTH OF PENNSYLVANIA :          NO. 8655-15
                                    :          3138 EDA 2017

             v.                       :

     OBRIAN LEWIS               :

<u>OPINION</u>

Branca, J.                                           January 9, 2018

## I.    INTRODUCTION

Obrian Lewis ("Defendant") appeals to the Superior Court from the sentence imposed by

this Court on September 15, 2017, by virtue of the jury's verdict of Guilty rendered on June 9,

2017. For the reasons that follow, Defendant's appeal is without merit.

## II.    STATEMENT OF THE CASE

### A.    Factual History

On November 4, 2015, at approximately 10:30pm, Defendant's ex-girlfriend Mytia

Purdie ("Ms. Purdie,") fearing for her safety, texted her father her new home address and the

following message: 721 Sandy st. Norristown pa #209 . . . My crib just in case anything happens

. . . . HE REALLY CRAZY HE UP HERE STALKING MY CRIB . . . . He mad cause I don't

want to be with him."[1] Minutes later Ms. Purdie texted Defendant that she and her father were

on their way to get a restraining order against Defendant.[2] Ms. Purdie would later tell authorities

---

[1] [N.T. 6/6/17, at 125-27, at Ex. C-8 (Photocopy of text messages from Mytia Purdie); N.T. 6/7/17, at 32-36, at Ex. C-22 (PowerPoint of Purdie cell phone)].
[2] [N.T. 6/6/17, 127 , at Ex. C-9 (Photocopy of text messages from Mytia Purdie)].



that Defendant had been calling and texting her all day long, starting early that morning, and at one point demanding she return a ring he had given her:[3]

> He had been calling me a Ho and a whore and threatening to hurt me and kill me. During one call I put him on a three way with my father and he was saying I was a whore. It all started after I got pregnant with our son. It is on and off when he acts like that. He just started coming back around about 3 weeks ago.

In the weeks leading up to the night of November 4th, Defendant's text communication with Ms. Purdie reflected his jealousy that Ms. Purdie was no longer with him and was, instead, romantically involved with Marcel Edwards ("Edwards.") On October 17, 2015, at 2:42am, Defendant texted Ms. Purdie demanding that she pick him up, take him to a hotel that he would pay for, and then threatened her, texting that if she was not 'with him' then she was the "Udafuknememytoo," ('You the fucking enemy too.')[4] Similarly, on October 20, 2015, Defendant texted Ms. Purdie, "Keepgoinbackwards . . .Witmarcel." ('Keep going backwards with Marcel.')[5] Ms. Purdie told investigators that, while she had dated Defendant years ago, they had parted after their son was born because Defendant "would always be putting his hands on me and hurting me and I couldn't take it anymore"; that in addition to stalking her constantly, Defendant had threatened to kill her many times ever since she first met him, and had once hit her with a gun while they were fighting.[6]

Months earlier, in March 2015, Defendant had also threatened Edwards's life in private messages through various Facebook accounts.[7] At trial, Montgomery County Detective William Mitchell, Jr. ("Detective Mitchell,") testified at length about those messages and posts in which

---

[3] [N.T. 6/6/17, at 136-40, 162-64, 200-202, 208-16, at Exs. C-10 (Mytia Purdie Statement 11/5/15,) C-13 (Facebook profile with photograph,) C-15 (Photocopy of test messages from Mytia Purdie cell phone,) C-18, C-19 (Photocopy of Mytia Purdie's cell phone records,) C-20 (Photocopy of text messages between Elliott Eberhardt and Mytia Purdie on 11/4/15,) C-21 (Cell phone records of Mytia Purdie and Elliott Eberhardt)].
[4] [N.T. 6/6/17, at 168-69, C-17 (Photocopy of text messages from Purdie cell phone, 10/17/15)].
[5] [N.T. 6/6/17, at 170-71 , at Ex. C-18 (Photocopy of texts from Purdie cell phone, 10/20/15)].
[6] [N.T. 6/6/17, at 136-40, 168-69, at Ex. C-10; N.T. 6/7/17, at 23, Ex. C-22].
[7] [N.T. 6/8/17, at 183-220, at Ex. C-68].

2

Defendant had threatened to kill both Edwards ("Cell") and Ms. Purdie ("Tia"). More specifically, Detective Mitchell identified the Facebook accounts for Edwards (alias, "Cellion Da Don") to which Defendant, originally from Jamaica, (under alias accounts in the names of "Will Brooks" and "Ciara Hill") sent repeated death threats, including but not limited to the following:[8]

> I'm gonna empty my clip in your head when we link up, pussy. . . . Don't run to her either, nigga. . . . I'm gonna take you out . . . . This is your life taker . . . . I'll be waiting on you. . . . Do yourself a favor and die tonight . . . . Fact, I'm coming. . . . Yo bitch ass hiding nigga. . . I'm close. . . . Who beefing over that bitch. I'm gonna show you what we Jamaicans do to sell out. . . . Meet me in the streets west Philly. . . . . I'm gonna kill you. . . . Then I'm gonna shoot up your funeral. . . . You all Yankee niggers think I'm a joke. . . . You the first example so come face me like a real nigga. That way you got a chance. . . . I'm going to kill you and Tia nigger. Don't watch or back. Just take them bullets. . . . You come take out that ho Mytia to Motel Six like shit nice. I got five G's on both you all heads. And tell your rug rats who kill you two, pussy. I'm in Philly all day with Kingston. 11 got my back yo. . . . You had fun at the motel with that ho pussy. I'm gonna be riding around day and night for your head and empty the whole 30 out in your head. Then I'm gonna bury that ho next to you. . . . Be a man, get your hammer, and fraud at least you got a chance. But guess what? I'm a ghost haunting up. First I'm gonna catch you in west or nut own and you going down.

In addition, Defendant even sent messages to uninvolved third parties, demanding Edwards's home address in an attempt to carry out his threats.

So, on November 4th, minutes after texting Defendant that she and her father were getting a restraining order, Ms. Purdie returned to her bedroom where her son was sleeping.[9] As she began to drift off to sleep herself, Ms. Purdie was awakened by the sound of multiple blasts of gunfire.[10] Defendant, whose cellphone records would later confirm that he traveled by train from Philadelphia to Ms. Purdie's apartment, made his way into her building armed (with multiple

---

[8] [N.T. 6/8/17, at 211-20, at Ex. C-68 (PowerPoint presentation of cell phone information); N.T. 6/6/17, at 119, at Ex. C-10]. In her statement to police, Ms. Purdie said Defendant lived in "Philly," and testified at trial that Defendant was originally from Jamaica, sometimes spoke with a Jamaican accent, and called her 'Tia.'

[9] [N.T. 6/6/17, 129].

[10] [N.T. 6/6/17, at 129-130, at Ex. C-10]. Ms. Purdie was awakened by between 5 and 10 gunshots. [N.T. 6/7/17, at 44-45]. Henry W. Weber, III, a neighbor of Purdie's, testified he heard 10-12 shots fired.

3

rounds of ammunition) intent on putting an end to Ms. Purdie's relationship with Edwards. Soon after entering the Sandy Hill Apartments, Defendant located Ms. Purdie's apartment where he saw an extension cord coming from inside the apartment under the front door to an outlet in the hallway. Defendant lied in waiting outside the door smoking at least two cigarettes. He then unplugged the extension cord and waited for someone to open the door. Shortly thereafter, he ambushed Edwards who had come out of the apartment. Edwards was shot as he came out of the apartment and as he tried to escape running down the hallway where he eventually collapsed. Defendant then proceeded to stand over Edwards shooting him 2 more times, once in the head execution style as Edwards lie curled up on the floor of the hallway.[11] Dr. Ian Hood, an expert in forensic pathology, would later testify that Edwards cause of death was multiple gunshot wounds.[12]

Edward's friend Quentin Watson, Jr. ("Watson,") who was in the apartment emerged from the apartment upon hearing the gun shots at which point Defendant was heard by Ms. Purdie to say, "You're next pussy."[13] Watson ran back into the apartment and tried to barricade the apartment door shut with the full weight of his body, leaning backwards, as evidenced by the gunshot wounds through his torso fired by Defendant through the door.[14] Defendant proceeded to shoot the door lock multiple times and then kick in the door. Upon entering, Defendant ejected the now-empty magazine from his weapon, inserted a new one and proceeded to shoot Watson multiple times as he lay on the floor. Defendant then made his way to Ms. Purdie's

---

[11] [N.T. 6/8/17, at 36-38]. Expert in forensic pathology, Dr. Ian Hood, and Montgomery County Detective Kevin Edward Schikel would later testify that Edwards had been shot multiple times (4) and twice, once in the head, while lying "on the ground curled up."

[12] [N.T. 6/7/17, at 185-209].

[13] [N.T. 6/6/17, at 135-38, 199, at Ex. C-10].

[14] [N.T. 6/7/17, at 218-241, at Exs. C-49 (Autopsy photos/diagram – Q. Watson), C-50 (Autopsy Report – Quentin Watson); N.T. 6/6/17, at 135-36, at Ex. C-10].

4

bedroom. Fearing for her life and hiding from Defendant, Ms. Purdie called 911 from her bedroom closet and the following chilling 911 call was recorded:[15]

| | |
|---|---|
| **Dispatcher:** | 911, where's your emergency? |
| **Mytia Purdie:** | U/I. |
| **Dispatcher:** | 911 you have an emergency? |
| **Defendant:** | Where you at? |
| | (Calmly)[16] What's up Kamari? (Defendant's 4-year old son) |
| | (Closet door opening) |
| | (Calmly)[17] Your turn. |
| **Mytia Purdie:** | No no . . . give me the gun . . .give me the gun . . . give me the gun . . . give me the gun . . . give me the gun . . . U/I . . . U/I . . . U/I . . . U/I. Give me the gun . . . give me the gun . . .call the cops!! U/I. |
| | (Sound of footsteps running) |
| **Dispatcher:** | 911? |
| **Mytia Purdie:** | Give me the gun . . . U/I |
| **Dispatcher:** | Hello? |
| **Mytia Purdie:** | People been shot. . . they all got shot. |
| **Dispatcher:** | What's your address? |
| **Mytia Purdie:** | 210 Airy Street. |
| **Dispatcher:** | 210 Airy? |
| **Mytia Purdie:** | Yea. |

---

[15] [N.T. 6/6/17, at 140-141, Exs. C-11 (Transcript of 911 calls); N.T. 6/7/17, at C-23 (Audio of 911 call)]. (At trial, the Commonwealth introduced the 911 call recording wherein Defendant can be heard **calmly** greeting his son, and then in the same breath telling Ms. Purdie, "Your turn."). The Court has included, parenthetically, its own characterization of Defendant's tone.

[16] Court's characterization.

[17] Court's characterization.

| Dispatcher: | East Airy or West Airy? |
| Mytia Purdie: | Hurry up |
| Dispatcher: | Miss? Hello? |
| | (Hang up) |

The call ended as Ms. Purdie fled her apartment. Defendant had dragged her by her hair, from her closet.[18] He then proceeded to drag her past their son from her bedroom on her knees at which point the hair piece by which Defendant had been dragging Ms. Purdie, gave way and she was able to escape. As Defendant chased her from the apartment, he said "Bitch you gonna die."[19] Outside, she managed to flag down a driver on Airy Street, who immediately drove her to the Norristown Police Department.

Minutes later, while walking to his parked patrol car in the police station lot in preparation to respond to a call, Officer Richard DeStefano ("Officer DeStefano") of the Norristown Police Department witnessed a Honda Accord racing towards him. The vehicle stopped immediately in front of him and a disheveled Mytia Purdie, only half-dressed with her breasts exposed, in ripped jeans exhibiting bloodied knees, sprang from the back seat, frantically screaming that "her baby daddy just shot someone in her apartment."[20] Officer DeStefano, who was now accompanied by Officer Geiser, would soon learn that Ms. Purdie had flagged down the vehicle after just barely escaping from her apartment where Defendant had gone on a shooting rampage, killing Edwards first and then Watson, and then assaulting Ms. Purdie in the direct presence of L.K., the 4 year old son she shared with Defendant.

---

[18] [N.T. 6/6/17, at 141-42, at Ex. C-12 (Brown evidence bag containing hair extension)]; [N.T. 6/6/17, at 82-83]. Officer DeStefano testified that Ms. Purdie's hair was a mess, her jeans were ripped and she had carpet burns on her knees from Defendant dragging her across her apartment floor.
[19] [N.T. 6/6/17, at Ex. C-12].
[20] [N.T. 6/6/17, at 78-79].

6

Officer DeStefano immediately dispatched several officers including Officer Christopher Smith ("Officer Smith") to the Park Place Apartments, at 721 Sandy Street in Norristown and escorted Ms. Purdie into the police station to speak to detectives. When he arrived, Officer Smith went to the south entrance of the apartment complex where he knew from experience the doors were frequently left ajar, which they were.[21] As soon as he entered the building, he took the staircase to the second floor, opened the double doors, and looked down the hallway where he saw the first shooting victim, later identified as Edwards, lying 20 feet away on his side, without any shoes.[22] Now accompanied by Officer Narkin, the officers slowly and cautiously made their way up the hallway, covering each other, to offer Edwards assistance. Upon reaching him they found he had had suffered what appeared to be a fatal gunshot wound to the head.

At that point, Officer Geiser arrived on the scene directing the officers to respond to an apartment where the door had reportedly been kicked in. Upon reaching Apartment 209, the officers found its entranceway littered with gun shell casings and its door jamb was completely destroyed from being kicked in, to the extent that the door was nearly off its hinges.[23] Officer Smith covered Officer Geiser as he entered the dark apartment, followed by Officer Narkin, where they found a second lifeless victim, Watson, lying on his stomach, covered with shell casings, next to the door.[24] Dr. Marianne Hamel, an expert in forensic pathology, would later testify at trial that she located approximately nine (9) gunshot entrance wounds while performing her autopsy on Watson.[25] With flashlights and handguns drawn, the officers secured the apartment, confirming no other occupants. It was then that the officers located an empty

---

[21] [N.T. 6/6/17, at 91].
[22] [N.T. 6/8/17, at 33-35, Ex. C-55 (Photograph grouping), C-55:A-E) (Individual photographs), C-5:F (Blow-up of C-55)].
[23] [N.T. 6/6/17, at 93. 100].
[24] [N.T. 6/6/17, at 102, 106].
[25] [N.T. 6/7/17, at 217-241, Exs. C-48 (five photographs and diagram); C-49 (autopsy photographs and diagram)].

magazine on the floor, indicating that Defendant had taken the time to reload his weapon upon entering the apartment.

Ultimately, the officers secured the scene and began their painstaking task of collecting the evidence Defendant left in his wake. In the meantime, Officer Miguel Montoya ("Officer Montoya") (of the Norristown Police Department) had responded to the scene and spotted Defendant as he stood, with his 4-year old son, at a corner exit of the apartment building waving the officer over.[26] As Officer Montoya approached, Defendant claimed that he had been attacked and admitted he had shot both Edwards and Watson. Defendant, who voluntarily agreed to go to the Norristown Police Department as part of investigation, rode with his son L.K. on his lap in the Officer's patrol car back to the station, ultimately, declining to give a statement.

The Commonwealth charged Defendant with two counts of Murder in the First, Second, and Third Degree, as well as, a variety of related charges.

## B. Procedural History

The case, indexed at Bill of Information 8655-2015, proceeded to a five-day trial after which the jury found Defendant guilty of Counts: One (Murder in the First Degree- Marcel Edwards,) Two (Murder in the First Degree-Quentin Watson, Jr.,) Seven (Burglary,) Eight (Criminal Trespass,) Eleven (Recklessly Endangering,) Twelve (Recklessly Endangering,) Thirteen (Simple Assault,) and Fourteen (Possession of Instrument of Crime).

On September 15, 2017, after reviewing the Presentence Investigation report, ordered in response to Defendant's pro se request, the undersigned conducted a sentencing hearing at which it heard testimony from two witnesses (Shalonda Bennett and Kimberly Ward) and admitted

---

[26] [N.T. 6/7/17, at 59].

8

three victim impact statements.[27] After Defendant declined to exercise his right of allocution, the Court proceeded to sentencing. In accordance with the applicable mandatory sentencing scheme, the Court sentenced Defendant to undergo two (2) consecutive terms of life imprisonment without the possibility of parole. In addition, Defendant was sentenced to consecutive sentences for burglary, recklessly endangering Mytia Purdie and L.K., and possession of a firearm, which resulted in an additional fourteen and a half (14 ½) to twenty-nine (29) years of imprisonment; as well as applicable restitution.[28] The Court concluded the hearing by informing Defendant of his full panoply of appellate rights, granting trial counsel's request to withdraw in light of Defendant's allegations of ineffectiveness, and appointing Joseph Hylan, Esquire, to represent Defendant on appeal.[29] Defendant did not file a Post-Sentence Motion. He did, however, on September 28, 2017, timely file a Notice of Appeal challenging the imposition of his sentence. On November 17, 2017, upon request of the court, Defendant filed a 1925(b) Concise Statement of Matters Complained on Appeal, pursuant to Pa. R.A.P. 1925(b).[30]

## III.   ISSUES PRESENTED

Defendant's 1925(b) Statement sets forth the following issues for review:

1.)    Considering, *inter alia*, the angry and emotional state of the Defendant--an anger fueled by a desperate and overwhelming concern for his son -- and his sudden and desperate confrontation with two heroin dealers, the verdict returned was against the weight of the evidence. (see the testimony of Mytia Purdie; June 6, 2017, pp. 117-208-and the testimony of Officer Miguel Montoya; June 7, 2017, pp. 55-171)

2.)    The Trial Court erred by refusing the Defendant's request to instruct the jury regarding Mytia Purdie's bias and animus toward the Defendant. (June 9, 2017; p. 5)

---

[27] [N.T. 9/15/17, at Ex. CS-1 (Shalonda Bennett,) CS-2(Kimberly Ward,) CS-3(Dawn Golden,) (10/31/17)].
[28] [N.T. 9/15/17, at 16-20, (10/31/17)].
[29] [N.T. 9/15/17, at 21-22, DS-1 (Post Sentence Rights Form,) (10/31/17)].
[30] Upon application, the Court granted appointed counsel a thirty-day extension within which to file his 1925(b) Statement. [Order, (10/18/17)].

9

3.) The Trial Court erred by refusing the Defendant's request for mistrial when the testimony of Officer Montoya referred to and reflected upon the Defendant's invocation of his right to remain silent. (see the testimony of Officer Montoya; June 7, 2017, pp. 74-76)

4.) The Trial Court erred by refusing to grant the Defendant's request that the Trial Court instruct the jury on "imperfect self-defense" namely, that the homicides were committed in the heat of passion. (June 9, 2017; pp. 2-5)

[Def.'s 1925(b) Statement, (11/17/17)].

## IV. DISCUSSION

On appeal, in addition to his claim that the jury's verdict was against the weight of the evidence, Defendant also asserts that the Court erred by both denying his motion for a mistrial based on an alleged violation of Defendant's right to remain silent and refusing to instruct the jury on Ms. Purdie's alleged bias and Defendant's alleged "imperfect self-defense." As addressed hereinafter, Defendant's claims are meritless.

The standard of review applied to claims raised on appeal is limited to determining whether the trial court abused its discretion or committed an error of law. *See Commonwealth v. West*, 937 A.2d 516, 521 (Pa. Super. Ct. 2007); Pa. R. Crim. P. 720. In evaluating a trial court's decision, an "abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous." *Commonwealth v. Greer*, 951 A.2d 346, 355 (Pa. 2008) (internal quotation omitted).

### i. Defendant Waived His Weight of The Evidence Claim.

Defendant's first claim on appeal that the verdict was against the weight of the evidence is waived. As such, the Court need not address its underlying merit.

10

Scan 8 01/11/2021

It is well-settled that to preserve a challenge to the weight of the evidence, an appellant must provide the trial court an opportunity to review such a claim before it is divested of jurisdiction.[31] Pa. R. Crim. P. 607; *Commonwealth v. Kinney*, 157 A.3d 968, 972 (Pa. Super. Ct. 2017) ((Failure to properly preserve the claim will result in waiver, even if the trial court addresses the issue in its opinion.); *Commonwealth v. Thompson*, 93 A.3d 478, 490 (Pa. Super. Ct. 2014) (Holding that appellant waived weight of the evidence claim by failing to file post-sentence motion.); *Commonwealth v. Sherwood*, 982 A.2d 483, 494 (Pa. 2009) (Challenge to a weight of the evidence claim must be raised with trial court or it will be waived.)

The record in this case is devoid of any written or oral motions, before or after sentencing raising a claim that the verdict was against the weight of the evidence and as such, Defendant's first claim is waived on appeal. In any event, the failure to assert such a motion was with good reason since, as addressed hereinafter, given the abundant evidence presented by the Commonwealth at trial, the verdict rendered by the jury was wholly appropriate.

### ii. The Court Properly Denied Defendant's Motion For Mistrial.

Next, Defendant claims that the Court erred in denying his motion for a mistrial. Defendant moved for a mistrial after the Commonwealth elicited testimony from Officer Montoya, which Defendant characterized as invoking Defendant's privilege against self-incrimination. Defendant's assertion is meritless.

It is well-settled that review of a trial court's denial of a motion for mistrial is limited to determining whether the trial court abused its discretion. *Commonwealth v. Brooker*, 103 A.3d 325, 332 (Pa. Super. Ct. 2014), *appeal denied*, 118 A.3d 1107 (Pa. 2015). "An abuse of

---

[31] Pa. R. Crim. P. 607 (A) (" A claim that the verdict was against the weight of the evidence shall be raised with the trial judge in a motion for a new trial: (1) orally, on the record, at any time before sentencing; (2) by written motion at any time before sentencing; or (3) in a post-sentence motion.")

11

discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will...discretion is abused." *Id.* Grant of a mistrial is only appropriate when an incident "is of such a nature that its unavoidable effect is to deprive the appellant of a fair and impartial trial." *Commonwealth v. Montgomery,* 626 A.2d 109, 113 (1993)).

Moreover, "[w]hile any reference to an accused's decision to invoke the right to remain silent is a clear violation of the constitutional right against self-incrimination, not every such reference requires the declaration of a mistrial." *Commonwealth v. Boone,* 862 A.2d 639, 646 (Pa. Super. Ct. 2004) (internal citation omitted); *Commonwealth v. Adams,* 39 A.3d at 318 (internal citation omitted) ("The mere revelation of a defendant's pre-arrest silence does not establish innate prejudice [where] it was not used in any fashion that was likely to burden defendant's Fifth Amendment right or to create inference of admission of guilt."). So long as the Court provides a prompt and adequate curative instruction or the reference is proven harmless no error ensues. *Id.* (citing *Commonwealth v. Clark,* 626 A.2d 154, 158 (Pa. 1993)); *Commonwealth v. Gbur,* 474 A.2d 1151, 1154 (Pa. Super. Ct. 1984) (internal citations omitted) (Prompt and adequate cautionary instructions can frequently cure what might be construed as reversible error.). In evaluating whether cautionary instructions can cure the alleged harm resulting from a reference to a defendant's invocation of his or her right to remain silence, the Court considers: 1) the nature of the reference to the defendant's silence; 2) how it was elicited; 3) whether the district attorney exploited it; and 4) the promptness and adequacy of the cautionary instructions." *Commonwealth v. Moury,* 992 A.2d 162, 176 (Pa. Super. Ct. 2010) (internal citation omitted). Moreover, "an error is considered harmless where the defendant was

12

not prejudiced or the prejudice was merely *de minimis,* the erroneously admitted evidence was cumulative of untainted evidence, or uncontradicted and properly admitted evidence of guilt was so overwhelming as to nullify any prejudice." *Id.* (internal citation omitted).

In this case, the Commonwealth elicited the following testimony from Officer Montoya about his interactions with Defendant moments after he had first confronted him standing at the door, holding his 4 year old son, and before Defendant had even become a suspect as Defendant had explained that he was the victim of an attack and shot his assailants in self-defense:[32]

| The Commonwealth: | What did you do next? |
|---|---|
| Officer Montoya: | Again, we had to communicate between some of the different officers. There was a shift change going on, so there was a lag there of information. We also had to communicate with some of the supervisors – some were on the scene and others were still at the police station – about what we had. At some point I advised my supervisor that I had Mr. Lewis and the firearm, and the decision was made that he needed to give a statement about what was going on. So I went back inside, and I spoke to Mr. Lewis and asked him if it would be okay to come to the police department to give a statement about what had gone on. |
| The Commonwealth: | Okay. And did the defendant comply? |
| Officer Montoya: | Yes; he agreed to that. The only other issue was, his child was there with him, with no other person to watch him. So we just decided that he would transport the child with himself. Both of them got into my car. He actually had the child sitting on his lap as we rode down there. |
| The Commonwealth: | Was the defendant handcuffed or anything at that point? |
| Officer Montoya: | No. |
| The Commonwealth: | You were just giving him a ride to the station? |
| Officer Montoya: | Yes; to make a statement. |

---

[32] [N.T. 6/7/17, at 71-72].

13

The Commonwealth:     Let me ask you, when you got to the station, what did you do --

Defense Counsel:     Judge, can we approach briefly?

The above-referenced exchange constitutes the entirety of defense counsel's bases for his objection and oral motion for a mistrial asserting that the Commonwealth had impermissibly referred to Defendant's invocation of his right to remain silent. At sidebar, trial counsel articulated his concerns as follows: [33]

Defense Counsel:     Judge, I have a serious concern, and I'm hashing it out in [my] mind how to deal with this. But this officer said, two times, that the defendant went back to give a statement. In fact, the defendant, when given his Miranda rights by detective Bradbury, declined to give a statement. So now what we have hanging out there, because of this officer's testimony – you know, I believe that this testimony implicates his Fifth Amendment right to remain silent. The officer should have never testified that he was brought back to the station because he was going to give a statement. He didn't give a statement. He did not waive his Miranda rights. When given his Miranda rights, he said, I'm not going to talk to you.

The Commonwealth:     Respectfully, Your Honor. In other parts of this trial, he gave many statements to detective Mitchell, he spoke to detective Bradbury. Not a formalized question and answer, but comments about his story of what happened. I think that this is harmless. We're going to not ask anything else. Because the officer was prepped about this. I think it was just an accidental slip. I think it's harmless though, because there's enough that's going to come in that the defendant did give his side of things to different law enforcement officers.

. . .

The Court:     Now, I take it that you think that that testimony, once given, coupled with the fact that the Commonwealth is not going to introduce any formal statement, that therefore that somehow violates the defendant's Fifth Amendment right.

---

[33] [N.T. 6/7/17, 72-83, 121-].

14

Defense Counsel: Absolutely it does. It absolutely does. And what you have here is, you have a situation where there is prejudice to the defendant. It is damaging to the defendant when you connect the dots, which the jury is clearly going to do. They heard testimony – which there was no reason for that testimony to be elicited – that the decision was made by the police that the police wanted him to give an interview. Similar to Molina.[34] They wanted to interview Molina, just like that that case. And that this defendant, after being told they wanted him to go down to the police department to be interviewed, said he would. No reason, at all, for that to be elicited.

The Court, however, immediately took issue with defense counsel's comparison of the circumstances presently existing compared to that which transpired in *Molina*, where the detective specifically testified that the defendant had refused to give a statement.[35] To which defense counsel responded as follows:

Defense Counsel: Right. But the jury is going to know later that, when he got to the police station, he did not give a statement, he was not interviewed.

The Court: How are they going to know that?

Defense Counsel: Because they're never going to hear an interview . . . .

The Court appropriately conducted the requisite four-part analysis and, despite determining it was unnecessary, gave a cautionary instruction at the request of, and approved by, the defense to ameliorate any alleged harm. First, the Commonwealth emphasized that the officer had not actually even testified that Defendant exercised his right to remain silent, per se. Instead, in response to the prosecutor's question —"What did you do next?"— the officer merely made an innocuous reference to the investigation proceeding along with Defendant's agreement to go to the station to make a statement.[36] Moreover, at the point in time to which Officer Montoya was

---

[34] *Commonwealth v. Molina*, 33 A. 3d 51 (Pa. Super. Ct. 2011).

[35] [N.T. 6/7/17, at 129].

[36] [N.T. 6/7/17, at 71, 135-36].

testifying, Defendant had just told Officer Montoya that he had been attacked and compelled to defend himself, and in that context, the reference to making a statement was clearly innocuous.

Next, in light of the prosecutor's credible assertion that he had not intentionally delved into the topic of Defendant's right to remain silent, the Court determined that the Commonwealth had not elicited the objectionable reference deliberately. Instead, and as borne out by the above-referenced excerpt, the objectionable testimony was elicited as part and parcel of the prosecutor's generalized line of inquiry of 'what happened next?'[37] The prosecutor explained that he had intended to elicit only the following two points from this portion of Officer Montoya's testimony: "One, that the defendant voluntarily took a ride to the borough; and two, that he was not handcuffed at the time. . . . So my intention, as soon as the officer mentioned to make a statement, I cut him off. That's what I was attempting to do. Not exploit it or make a big deal of it."[38]  In addition, the prosecutors emphasized that they had even tried to avoid just this sort of scenario from unfolding by specifically advising their officers and detectives, during their witness preparation, to refer only to Defendant's spontaneous utterances and avoid all together Defendant being Mirandized which indeed they did.[39] Further, the Court determined that the Commonwealth did not exploit the Officer's innocuous reference to Defendant making a statement, and had instead, tried to move the testimony smoothly past the reference to avoid any undue attention by the jury.

Finally, despite its determination that a cautionary instruction was unnecessary, in light of the attenuated and vague nature of the reference, the general context in which it was elicited, the fact that Defendant had already made statements that he had been attacked and had acted in

---

[37] [N.T. 6/7/17, at 136 (Referencing *Commonwealth v. Roe*, 2016 WL 5947484, at *6 (Pa. Super. Ct. Oct. 13, 2016)].
[38] [N.T. 6/7/17, at 139-40].
[39] [N.T. 6/7/17, at 77].

16

self-defense, and its prior explicit instructions to the jury on the right to remain silent, which would again be emphasized in its closing, the Court nonetheless, granted Defendant's request and promptly gave the following instruction as approved by Defendant:[40]

> Before we continue, I want to remind you that I told you in my opening instructions that all of my instructions that I give to you apply, whether they be at the beginning or the end or during the trial, and certainly this is one of those occasions where you need to do that.
>
> Officer Montoya testified as to the defendant being asked to make a statement. And that testimony was improper testimony, and you should disregard it. As I told you before, a defendant has an absolute right to remain silent. Any reference to a defendant being asked to make a statement is improper in that regard. And you cannot hold against a defendant the fact that a defendant chooses to remain silent, nor can you infer any guilt in that regard. So any testimony from Officer Montoya as to the defendant being asked to make a statement is to be totally disregarded by you. Just put it out of your mind.

As demonstrated, the Court administered the above-referenced cautionary instruction at the earliest possible opportunity, as soon as it reconvened following Defense Counsel's sidebar request. The Court's instruction thoroughly and succinctly reiterated its prior prophylactic introductory instructions to the jury on the right to remain silent, and directed the jury to disregard the improper testimony. *See Adams,* 39 A.3d at 318; *Commonwealth v. Moury,* 992 A.2d 162, (Pa. Super. Ct. 2010) (Court concluded that no mistrial was warranted where the trial court offered a prompt and adequate curative instruction.); *Boone,* 862 A.2d 639 (Objectionable exchange referencing right to remain silent was harmless in light of the ample evidence presented by the Commonwealth which essentially neutralized any prejudicial effect which the detective's testimony might have had.) Moreover, in the final analysis, any alleged error was harmless as the abundant evidence put forth by the Commonwealth, discussed in more detail

---

[40] [N.T. 6/7/17, at 151].

17

*infra*, overwhelmingly supported the jury's verdict, and nullified any alleged prejudice or rendered the prejudice *de minimis*. *See Moury, Adams, supra.*

### iii. The Court Properly Denied Defendant's Requested Jury Charges.

Finally, Defendant claims that the Court erred by refusing to instruct the jury on Ms. Purdie's bias, as well as on the defense of imperfect self-defense and specifically, 'heat of passion.' For the reasons that follow, Defendant's claims are factually and legally without basis.[41]

### *Bias*

Defendant requested that the jury be instructed that the fact that Ms. Purdie was facing open criminal charges at the time she cooperated with the Commonwealth tended to show her motive and bias to give statements and/or testimony favorable to the Commonwealth in this case.[42] As will be discussed, the jury was indeed so charged.

At trial, Defense Counsel relied on *Commonwealth v. Evans*, 512 A.2d 626 (Pa. 1986), in which the Pennsylvania Supreme Court reversed and remanded for a new trial where the defense was precluded from questioning the prosecution's cooperating witness "whether he had been promised or expected leniency with respect to other criminal charges pending against him." There, the Court held that, in the absence of such questioning, the jury was not in a position to consider whether the witness's testimony may have been biased and self-interested on account of the number and seriousness of pending cases against him. *Id.* at 629. The Court explained its reasoning as follows::

---

[41] Given Defendant's vague allusion to Ms. Purdie's animus in its 1925(b) Statement, the Court is unable to either discern the basis for such a claim, nor Defendant's preservation of this alleged issue below. As such, the Court deems waived any claims of error attributable to the Court's refusal to instruct the jury on Ms. Purdie's vaguely alleged animus.
[Def.'s Prop. Pts. for Charge, (3/3/17)].

[42] [N.T. 6/9/17, at 3-6]; [Def.'s Prop. Pts. for Charge, (3/3/17)].

18

[W]henever a prosecution witness may be biased in favor of the prosecution because of outstanding criminal charges or because of any non-final criminal disposition against him within the same jurisdiction, that possible bias, in fairness, must be made known to the jury. Even if the prosecutor has made no promises, either on the present case or on other pending criminal matters, the witness may hope for favorable treatment from the prosecutor if the witness presently testifies in a way that is helpful to the prosecution. And if that possibility exists, the jury should know about it.

*Id.*, 512 A.2d 626, 631–32 (Pa. 1986).

Here, however, contrary to that which transpired in *Evans*, the Court permitted Defense Counsel ample opportunity to cross-examine Ms. Purdie, as reflected in part below:[43]

Defense Counsel: Ms. Purdie, I just have a few more questions .... you said you didn't want to be here. In fact, do you have some type of electronic monitoring bracelet on your ankle?

Ms. Purdie: Yes.

Defense Counsel: And did the Commonwealth have that put on you to make you come to court today?

Ms. Purdie: Yes.

Defense Counsel: And were you picked up by the detectives and brought in front of the Judge?

Ms. Purdie: Yes.

Defense Counsel: And as has been indicated, you have been convicted of making false statements to authorities in the past; right?

The Commonwealth: Objection. Beyond the scope of redirect.

The Court: Sustained.

Defense Counsel: You have an open case for stealing?

The Commonwealth: Objection. Beyond the scope of redirect.

Defense Counsel: It's credibility.

---

[43] [N.T. 6/6/17, at 204-207].

19

The Court: Overruled.

Defense Counsel: You have an open case for theft right now; right?

Ms. Purdie: Yes.

Defense Counsel: And that's in Montgomery County; right?

Ms. Purdie: Yes.

Defense Counsel: And that's being prosecuted by the Montgomery County D.A.'s office, the D.A.'s office to my left; right?

Ms. Purdie: Yes.

Defense Counsel: And because of your prior retail thefts, that charge is actually a felony –

The Commonwealth: Objection, Your Honor. This is beyond the scope of redirect.

Defense Counsel: Judge, it's credibility. It's always relevant on cross-examination.

The Court: Credibility is always relevant. I'm not so sure that question is a proper one. So I will sustain the objection to that question.

Defense Counsel: Are you awaiting sentencing or disposition of that charge?

Ms. Purdie: I don't know.

Defense Counsel: Well, you did not get sentenced on that charge yet; correct?

Ms. Purdie: Correct.

Defense Counsel: And you certainly hope not to have to go to jail; right?

Ms. Purdie: I'm not going to jail.

Defense Counsel: You know that already?

Ms. Purdie: Yes, I do.

Defense Counsel: Okay. Thanks for sharing that.

SCANNED 08/11/2021 8

As reflected above, Defense Counsel's thorough cross-examination permitted the jury the opportunity to examine Ms. Purdie's potential for bias and a possible motive for testifying favorably for the Commonwealth.

Likewise, and in response to Defense Counsel's cross-examination, and implicit suggestion that Ms. Purdie had a motive to lie and testify untruthfully to garner a better result from the Commonwealth on her open cases, the prosecution here was compelled to set the record straight by permitting Ms. Purdie an opportunity to explain her state of mind to the jury. Ms. Purdie appeared nervous and barely audible throughout direct, as even the Court felt compelled to observe during disposition of an objection posited by Defense Counsel precipitated in part, by Ms. Purdie's slow, stuttered, and inaudible responses.[44] Moreover, the longer she remained on the stand, the more evasive and uncomfortable she appeared to be, as addressed and reflected in the following exchange with the prosecutor:[45]

The Commonwealth: Do you understand what I showed you to refresh your recollection?

Ms. Purdie: I do. I'm just – I don't even want – I don't even want to be here. Like, I'm frustrated. Like, I just want to leave. Seriously, I do. So my mind is, like, blocked right now.

. . .

The Commonwealth: Why didn't you want to come to Court and testify? Tell us, why didn't you want to come.

Ms. Purdie: Do I have to answer that?

The Court: Answer the question, please, ma'am.

Ms. Purdie: I'm scared I'm going to get hurt in the streets. That's why.

---

[44] [N.T. 6/6/17, at 132-34 (The Court: "My observation for the record is, this witness is very nervous . . . . And I don't know what the problem is, but she appears to be in some way frightened.")]

[45] [N.T. 6/6/17, at 203-207].

21

Thus, given the breadth of Defense Counsel's cross-examination of Ms. Purdie regarding her potential bias and bases for cooperating with the Commonwealth, the jury was fully apprised of any arguable biases Ms. Purdie may or may not have been harboring.

Moreover, and contrary to Defendant's instant assertion, the Court did, in fact, grant Defense Counsel a specific jury charge, in addition to its standard instructions on credibility and bias, which it determined adequate under the circumstances, stating, "Nonetheless, in the scheme of things, I'll give that charge, and I'll put it in right after the charge that talks about Ms. Purdie's prior convictions. . . ." So, the Court charged the jury as follows: [46]

> You've heard evidence that one of the witnesses, Mytia Purdie, has been convicted of a crime of false identification and of forgery. The only purpose for which you may consider this evidence of prior convictions is in deciding whether or not to believe all or part of Mytia Purdie's testimony. In doing so, you may consider the type of crime committed, how long ago it was committed, and how it may affect the likelihood that Ms. Purdie has testified truthfully in this case.
>
> Now, you also heard that Mytia Purdie has open charges in Montgomery County for Retail Theft and Receiving Stolen Property. You may consider this evidence, if you wish, as tending to show Ms. Purdie's bias to testify favorably for the Commonwealth, in order to receive a benefit from the Commonwealth on her charges.

In the final analysis, the record reflects that: Defense Counsel thoroughly cross-examined Ms. Purdie as to her open charges and potential biases and motives to cooperate with the Commonwealth; defense counsel argued these facts to the jury in his closing;[47] the jury was provided with evidence about the circumstances surrounding Ms. Purdie's testimony to weigh for themselves any potential motives or biases; and, the Court's standard instructions, coupled with

---

[46] [N.T. 6/9/17, at 68 ("[A] witness's recollection of those things that have transpired in the past may be out of harmony with the truth by reason of bias or prejudice. . . .You will likewise consider the interest that the witness had in the outcome of the case, if any; and whether or not that has tended, either consciously or unconsciously, to color the testimony of the witnesses.")]; [N.T. 6/9/17, at 72].

[47] [N.T.6/9/17, at 37-38].

22

the additional instruction on Ms. Purdie's open charges, adequately advised the jury as to the precepts governing their deliberations and their duty to weigh each witness's credibility. Therefore, Defendant's claim that the Court erred in refusing to charge the jury as to Ms. Purdie's bias and animus is contrary to the record, and meritless.

### *Heat of Passion*

Defendant's claim that the Court erred by refusing to instruct the jury on imperfect self-defense, based on the heat of passion under which Defendant was allegedly acting, is equally and wholly unavailing, as a review of the record demonstrates no bases for such an instruction.

Courts have held that imperfect self-defense may exist when "a defendant actually, but unreasonably, believed that deadly force was necessary." *See Commonwealth v. Sasse*, 921 A.2d 1229, 1237 (Pa. Super. Ct. 2007). Thus, "a self-defense claim is imperfect in only one respect—an unreasonable rather than a reasonable belief that deadly force was required to save the actor's life." *Commonwealth v. Bracey*, 795 A.2d 935, 947 (Pa. 2001). To justify an instruction on imperfect self-defense, "the defendant must not only show that he was protecting himself against the use of unlawful force but must also show that he was free from fault in provoking or continuing the difficulty which resulted in the killing." *Id.*; *see* 18 PA. CONS. STAT. § 505.

At the close of trial, Defense Counsel argued that the Court should provide the jury with an instruction on voluntary manslaughter, heat of passion.[48] Contrary to Defendant's general claim, the Court instructed the jury on 'imperfect self-defense,' as part of its voluntary manslaughter charge; thereby providing the jury an alternative to consider should they chose to

---

[48] [N.T. 6/8/17, at 273-74].

convict Defendant of a lesser degree of homicide.[49] As demonstrated below, the Court did in fact

instruct the jury on "imperfect self-defense" as follows:[50]

On the other hand, a killing is without malice if the perpetrator acts under circumstances that reduce the killing to Voluntary Manslaughter.

When deciding whether the defendant acted with malice, you should consider all of the evidence with regard to his words, conduct, and the attending circumstances that may show his state of mind. If you believe that the defendant intentionally used a deadly weapon on a vital party of Marcel Edward's body, you may regard that as an item of circumstantial evidence, from which you may infer, if you choose, infer that the defendant acted with malice.

Let's talk about voluntary manslaughter. As my earlier definition of malice indicates, there can be no malice when certain reducing circumstances are present. When these circumstances are present, a killing may be Voluntary Manslaughter but never murder. This is true when a defendant kills under an unreasonable mistaken belief in justifying circumstances. Accordingly, you can find malice and murder only if you are satisfied beyond a reasonable doubt that the defendant was not under unreasonable belief that circumstances were such that if they existed, he would have been justified in the killing.

The reducing circumstances of a defendant acting under an unreasonable belief that the circumstances of the killing were justified applies where, (a), the defendant actually believed that he was in immediate danger of death or serious bodily injury at the time that he used deadly force, and this belief was unreasonable in light of the facts as they appeared to him at the time; (b), the defendant did not provoke the use of force by the alleged victim, by engaging in conduct that showed it was his intent to cause death or serious bodily injury to the alleged victim; and (c), that the defendant did not violate his duty to retreat to the place where the killing occurred.

. . .

Therefore, you can find malice and murder only if the Commonwealth proves beyond a reasonable doubt one of the following elements, and you must make this determination separately as to each of the alleged victims:

The defendant did not actually believe that he was in immediate danger of death or serious bodily injury from Marcel Edwards at the time he used deadly force. Note that the unreasonableness of defendant's belief is not the issue here. The question is whether the defendant actually believed such an immediate danger

---

[49] [N.T. 6/9/17, at 65-124, Court Ex. 1 ("Charge")].
[50] [N.T. 6/9/17, 95-98]. The Court repeated its instruction as to Watson as well.

24

existed at the time he used deadly force. And to prove malice for this element, the Commonwealth must prove that the defendant did not actually hold such a belief.

Second. The defendant provoked the use of force by the alleged victim by engaging in conduct that showed that it was his intent to cause death or serious bodily injury to the victim; or the defendant could have avoided the use of deadly force by retreating from the place of killing.

Now, if you do not find the defendant had malice and committed murder, you may find him guilty of Voluntary Manslaughter, as long as you are satisfied that the following three elements have been proven beyond a reasonable . . . .

With regard to Defendant's more specific companion claim that the Court erred in failing to specifically instruct the jury that Defendant acted in a heat of passion, the evidence at trial failed to support such an instruction. A heat of passion defense requires a defendant to prove: (1) provocation on the part of the victim, (2) that a reasonable man who was confronted with the provoking events would become "impassioned to the extent that his mind was incapable of cool reflection," **and** (3) that the defendant did not have sufficient cooling off time between the provocation and the killing. *Commonwealth v. Mason*, 130 A.3d 601, 628 (Pa. 2015) (internal citation omitted) (emphasis added); *Commonwealth v. Busanet*, 54 A.3d 35, 55 (Pa. 2012) (Court held that record did not support heat of passion defense where victim's threats against defendant were made weeks prior to the shooting, thereby providing defendant sufficient cooling off period to engage in cool reflection); *see also Commonwealth v. Sanchez*, 82 A.3d 943, 980 (Pa. 2013) ("If any of these be wanting—if there be provocation without passion, or passion without a sufficient cause of provocation, or there be time to cool, and reason has resumed its sway, the killing will be murder.").

In this case, the evidence presented at trial demonstrated that Defendant had a well-documented history of threatening the life and well-being of both Ms. Purdie and Edwards. The victims here in no way provoked Defendant's violent attack against them. Instead, the evidence

25

revealed that these victims were caught off-guard by Defendant's rampage. Moreover, the jury heard for itself Defendant's cool, calm tone as it listened to the audio from the 911 call where Defendant calmly greeted his son as in an everyday occurrence, and calmly told Ms. Purdie that is was her turn to be killed.[51] Moreover, at trial, the Commonwealth called Henry W. Weber, III, a neighbor of Purdie's, who testified that minutes after he heard 10-12 shots, a younger black gentlemen holding a young boy's hand appeared knocking lightly at his door and asked him to call the police.[52] Mr. Weber further testified that the man was "[v]ery calm. . . . [n]ot excited or anything . . . . [v]ery polite" and demonstrated no injuries as far as he could recall.[53] Likewise, Officer Montoya testified at trial that his appearance and demeanor belied any claim by Defendant that he had moments earlier acted in a heat of passion in his rampage. Officer Montoya recalled the following:

> "He was very calm. He was not yelling. When I asked him questions, he responded in a calm manner. He wasn't sweating or pacing or exhibiting anything else to make me feel that he was stressed out or hiding anything else like that. . . . I believe he was wearing this hoodies over top of long pants, and shoes or sneakers. None of that clothing was disheveled, torn, damaged. He didn't seem to have any sign of injury. There was no blood or anything else that I could observe on him."[54]

Defendant's chilling sangfroid captured by the 911 audio recording aptly reflects the calculating nature of Defendant's assault that evening. Moreover, evidence collected during the officers' investigation, including 2 cigarette butts[55] he left behind in the hallway as he lay in wait for his attack, an empty magazine just inside the apartment doorway reflecting that he took the

---

[51] [N.T. 6/6/17, at 140-141, Exs. C-11 (Transcript of 911 calls); N.T. 6/7/17, at C-23 (Audio of 911 call)].

[52] [N.T. 6/7/17, at 44-48].

[53] [N.T.6/7/17, 46-53, at Ex. C-23 (CD of 911 call)].

[54] [N.T. 6/7/17, at 64].

[55] [N.T. 6/8/17, at 180-82, at Ex. C-67 (Evidence bag containing items found on Obrian Lewis)].

time to reload, cell phone tower data,[56] the victims' defensive wounds, Defendant's prior threats

to Edwards that Defendant was going to kill him; Defendant's repeated threats memorialized by

text messages he had sent Ms. Purdie reflecting that Defendant stalked and harassed Ms. Purdie in

the hours leading up to his violent rampage, all overwhelmingly evidence a premediated,

unprovoked double murder.[57]  As such, the record did not support a heat of passion instruction.

### Harmless Error

Finally, even assuming one or more of Defendant's claims on appeal are deemed valid,

they amount to harmless error.  It is well-settled that not all alleged errors at trial entitle a

defendant to a new trial, and instead, Pennsylvania's harmless error doctrine reflects the reality

that an accused is entitled to a fair trial, not a perfect trial." *Commonwealth v. West*, 834 A.2d

625, 634 (Pa. Super. Ct. 2003).  An error is harmless where:

> "(1) the error did not prejudice the defendant or the prejudice was *de minimis;* or
> (2) the erroneously admitted evidence was merely cumulative of other untainted
> evidence which was substantially similar to the erroneously admitted evidence; or
> (3) the properly admitted and uncontradicted evidence of guilt was so
> overwhelming and the prejudicial effect of the error so insignificant by
> comparison that the error could not have contributed to the verdict."

*Commonwealth v. Passmore*, 857 A.2d 697, 711 (Pa. 2004).

Accepting the overwhelming evidence as a whole as set forth at length above, the import

of the Court's alleged refusal to provide Defendant a mistrial or the sought-after jury instructions

was *de minimis* at best.  Moreover, given Defendant's admission that he shot both victims,

coupled with the dearth of evidence to support his claim that he acted in "self-defense," let alone

a heat of passion, no reasonable possibility exists that the Court's refusal to instruct the jury as

requested resulted in either an unfair trial or one in which the verdict was against the weight of

---

[56] [N.T. 6/8/17, at 182, at Ex. C-68 (PowerPoint presentation of cell phone information)].

[57] [N.T. 6/7/17, at Ex. C-22 ("Powerpoint of Purdie cell phone")].

27

the evidence. The ample, credible evidence detailed *supra*, overwhelmingly proved beyond a reasonable doubt that Defendant committed a cold, calculated double homicide after lying in wait and luring one of the victims, Edwards, out of the apartment. The jury acted well within its province in finding Defendant guilty of the underlying crimes of which he was convicted.

## V.    CONCLUSION

Accordingly, the trial court requests that the judgment of sentence imposed on Defendant, Obrian Lewis, on September 15, 2017, be AFFIRMED.

BY THE COURT:

THOMAS C. BRANCA,                    J.

Copies of the above Opinion
Mailed on:  1/⁹ /18
**By First Class Mail:**
Joseph Hylan, Esquire
**By Interoffice Mail:**
Montgomery County District Attorney - Appellate Division
Deputy Court Administrator-Criminal

Secretary

28